AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT
10/12/22

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

5500 Autumn Hills Dr., Apt. 3, Trotwood, Ohio including any garages, vehicles, storage lockers, curtilage, cabinets, sheds, closets or outbuildings at this location

Case No. 3:22-mj-339

## APPLICATION FOR A SEARCH WARRANT BY TELEPHONE

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1

located in the _____Southern_____ District of _____Ohio_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC s. 841(a)(1) | possession with intent to distribute controlled substances |
| 21 USC s. 846 | conspiracy to distribute and possess with intent to distribute controlled substances |
| 21 USC s. 843(b) | use of a telephone communication facility in the commission of a Title 21 offense |

The application is based on these facts:

See Attached Affidavit of Robert M. Buzzard

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ Robert Buzzard*
Applicant's signature

Robert M. Buzzard, SA of the FBI
Printed name and title

Sworn to before me via telephone.

Date: 10/12/2022

City and state: Dayton, Ohio

Caroline H. Gentry
United States Magistrate Judge

# AFFIDAVIT IN SUPPORT OF APPLICATION

I, Robert Buzzard, hereby duly sworn, declare and state:

## INTRODUCTION

1. I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI"), assigned to the Cincinnati Division, Dayton, Ohio Resident Agency. I therefore am an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 21 U.S.C. § 878. Moreover, I am an "investigative law enforcement officer" within the meaning of 18 U.S.C. § 2510.

2. I have served as an FBI SA since January 2002. I am currently assigned to the Cincinnati Division, Dayton Resident Agency and serve on the FBI's Southern Ohio Safe Streets Task Force (SOSSTF). Since 2002, I have participated in investigations involving narcotics trafficking and have received specialized training on the subject of narcotics trafficking and money laundering from the FBI. I have been personally involved in investigations concerning the possession, manufacture, distribution, and importation of controlled substances, as well as methods used to finance drug transactions. Based on my training and experience – including my participation in the investigations referenced above – as well as discussions and interactions with other experienced FBI SA's, Task Force Officers ("TFO"), and narcotics investigators, I am familiar with the manner in which drug traffickers and their organizations operate within the United States. Based on my aforementioned training and experience, I am familiar with the modus operandi of persons involved in the illicit distribution of controlled substances and as a result, knows the following:

1

a. It is common practice for drug traffickers to hide their assets, their addresses, their telephone numbers and beeper/pager services by using other person's names in order to avoid detection by law enforcement officials

b. It is common practice for drug traffickers to often maintain residences which are used as "stash houses" or locations for drug storage and distribution, and use "nominees" to obtain telephone service, utility service, and other services to hide the true identity of the owner or person who will use that service.

c. That drug traffickers often place assets in corporate entities in order to avoid detection of those assets by law enforcement officials.

d. It is common practice, that even though these assets are in nominee names, drug traffickers will continue to utilize these assets by exercising dominion and control over them.

e. It is common practice that drug traffickers possess large amounts of U.S. Currency in order to finance their ongoing illicit drug business.

f. It is common practice that drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of drugs. Drug traffickers commonly front (provide drugs on consignment) to their clients. The books, records, receipts, notes, ledgers, and other documents are kept where the drug traffickers have ready access to them.

g. It is common for drug traffickers to provide false information to law enforcement officials regarding their identity and the address of their actual residence.

h. That persons involved in drug trafficking conceal from law enforcement in their residences, vehicles, and businesses the following items: drugs, large amounts of currency, financial instruments, jewelry, automobile titles, other items of value and/or proceeds of drug

2

transactions, and evidence of financial transactions relating to the acquisition and concealment of large sums of money resulting from drug trafficking activities.

   i. When drug traffickers amass large proceeds from the sale of drugs, they attempt to hide the true source of these profits, otherwise known as laundering the money. To accomplish this, drug traffickers many times utilize banks and/or financial institutions with their attendant services, including but not limited to, cashier's checks, money drafts, and letters of credit. Other entities used to launder drug proceeds include real estate firms and purported legitimate business fronts.

   j. Drug traffickers commonly travel to facilitate their trafficking activities. After purchasing drugs, traffickers commonly transport, or cause to be transported, drugs to areas in which they will be distributed. Common methods of transportation include, but are not limited to, commercial airlines, and rental/private automobiles.

   k. It is common practice that drug traffickers commonly maintain books and similar documents which reflect names, addresses, and/or telephone numbers of their associates in the drug trafficking organization. This information can often be stored in cellular phones in places such as the contacts list.

   l. Drug traffickers often take, or cause to be taken, photographs of themselves, their associates, their property and their product, and that the photographs are usually maintained at the residences and/or businesses of drug traffickers. Photographs such as these can commonly be found and stored in cellular phones.

   m. Drug traffickers commonly have in their possession, (that is on their person, at their residence, and/or their business) weapons, including firearms of various types. Firearms

are used to protect and secure a drug trafficker's property which may include, but is not limited to, narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency.

      n.      Drug traffickers frequently maintain hidden compartments within their residence and vehicles to hide drug trafficking evidence (money, ledgers, drugs, etc.), bury evidence in containers such as shoe boxes, or hide the evidence in safes.

      o.      The exact quantities, prices, dates, and methods of delivery of drugs are seldom discussed in detailed terms over the telephone. These details are usually agreed upon during face-to-face transactions. For this reason, most telephone conversations regarding drugs are very brief and often in code, understood by the traffickers and designed to mislead or confuse non-participants of the conversations. Drug traffickers make extensive use of cellular phones and text messaging beepers/pagers to facilitate contacting one another. When calling a beeper or text messaging, traffickers commonly input the number that should be called and sometimes add additional instructions in the form of additional digits. The structure of a drug distribution organization usually consists of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers. The wholesale distributors often have more than one source of supply, and likewise the retail distributors often obtain drugs from more than one wholesale distributor. After receiving a quantity of drugs, the source of supply will often move the drugs to a location other than where he/she sells them to the wholesale distributors. The location of the source of supply's so-called "stash house" is generally a well-guarded secret known only to the source of supply and his closest associates. Most of the drugs, as well as diluting and packaging materials and weighing equipment, are usually kept at the "stash house." Only those amounts needed for immediate sale are usually kept at the point of sale.

4

p.    Drug traffickers frequently use rental vehicles for everyday travel and will maintain another vehicle, usually at an out of sight location, to facilitate their drug trafficking business.

q.    Evidence of past communication between drug traffickers can be found in saved or deleted text messages, call logs, and other forms of electronic communication occurring over, stored in, or accessed by the cellular phone.

r.    I have repeatedly encountered a practice wherein drug traffickers distribute a cellular telephone number to their drug customers, often described by traffickers as a "money phone." The money phone is used primarily to communicate with those customers. The customers will subsequently call the trafficker on that cellular telephone number to arrange a purchase of drugs as needed. The trafficker will many times field calls from several customers at once, and then direct all those customers to travel in their car to a designated meeting point. Once all the customers have driven to the designated place, the drug trafficker will appear in his vehicle, quickly conduct hand to hand drug transactions with each customer, and then drive away.

## PURPOSE OF AFFIDAVIT

3.    I make this affidavit in support of an application for search warrants for the following residences – namely:

a.    8 S. Sunrise Ave., Trotwood, Ohio 45426, including any outbuildings, garages, sheds, or vehicles located on its curtilage (hereinafter "Sunrise Residence"). The Sunrise Residence is described more fully in Attachment A, which is incorporated herein by reference.

b.    5500 Autumn Hills Dr., Apt. 3, Trotwood, Ohio 45426 (hereinafter "Autumn Residence"). The Autumn Residence is described more fully in Attachment A-1, which is incorporated herein by reference.

4. As detailed more fully below, I submit that there is probable cause to believe that evidence of a crime as well as contraband, fruits of a crime or other items illegally possessed in relation to the following offenses exist and can be found inside the Sunrise and Autumn Residences -- namely:

    a. Possession with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, § 841(a)(1);

    b. Use of a Communication Facility to Facilitate the Commission of an Offense Under Title 21, in violation of Title 21, United States Code, § 843(b).

    c. Conspiracy to Possess with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, § 846.

5. A list of specific items to be seized from the Sunrise and Autumn Residences is attached hereto as Attachment B, and Attachment B is incorporated herein by reference. Based on my training and experience as well as the facts contained in the affidavit, I believe that there is probable cause to believe that the items listed in Attachment B will be found at/in these locations.

6. I have not included every detail of the investigation, but only information necessary to establish probable cause that evidence associated with the above-described drug trafficking offenses is located at the Sunrise and Autumn Residences.

**PROBABLE CAUSE**

7. During September 2022, I received information from a confidential source identified hereinafter as CS1. Notably, CS1 has provided truthful and reliable information to me in the past, which resulted in the seizure of kilogram quantities of illegal narcotics as well as the identification of drug dealers operating in the Dayton, Ohio area. Even though CS1 has provided information to law enforcement in hopes of receiving consideration concerning a

potential prosecution of CS1, I nevertheless find CS1 to be truthful and credible. CS1 provided the following information to me in September 2022:

    a.    CS1 identified, among others, JERRONTAE MCCOMB ("MCCOMB"), JONATHAN WILLIAMS ("WILLIAMS"), and CAMERON HARRIS ("HARRIS") as large-scale drug traffickers collectively distributing drugs from the Trotwood, Ohio area. Through personal knowledge, CS1 knew that HARRIS, MCCOMB, and WILLIAMS currently used the Autumn Residence to store, mix, package and sell illegal drugs, including fentanyl and methamphetamine. According to CS1, the group actively has used the Autumn Residence since August 2022 through October 2022. (I received this October date from CS1 during a follow up conversation with CS1 this month). CS1 advised that the group stored drugs at locations in addition to the Autumn Residence to avoid a bulk seizure of narcotics by police, but CS1 did not know where those locations were.

    b.    CS1 indicated that HARRIS, MCCOMB, and WILLIAMS used cellular telephones (commonly known as "money phones") to arrange and complete narcotics transactions with their customers. As CS1 explained, HARRIS, MCCOMB, and WILLIAMS received calls on their "money phone" from customers who placed an order for narcotics; HARRIS, MCCOMB, and WILLIAMS then directed the customers to a certain area where they would complete a car-to-car transaction (an exchange of drugs for money). CS1 reported that: HARRIS drives a Volvo sedan, a Maserati SUV, and a Volvo SUV; MCCOMB drives a blue Audi SUV and a black Jeep Grand Cherokee; and that WILLIAMS drives a light blue Chevrolet Impala.

    c.    I have reviewed criminal history reports for WILLIAMS and HARRIS. I know that WILLIAMS has a prior federal conviction for a drug offense. Specifically, during

7

2014, WILLIAMS was convicted in Case No. 3:13CR139, in the United States District Court for the Southern District of Ohio, for conspiring to possess with intent to distribute heroin and sentenced to 46 months of imprisonment. He was released from the BOP sometime in the mid-2010s and placed on supervised release which he violated in 2020, resulting an another 18 month prison term. For his part, HARRIS also has a federal conviction from 2017 for being a felon in possession of a firearm; a drug charge alleged against him at that time was ultimately dismissed. MCCOMB is on active parole with the state of Ohio.

8. On or about September 1, 2022, I conducted surveillance at the Autumn Residence and, consistent with CS1's statements, observed a black Maserati SUV parked near the entrance of the apartment.

9. On or about September 22, 2022, I conducted surveillance at the Autumn Residence, and consistent with CS1's statements, observed a silver Volvo sedan and light blue Chevrolet Impala parked near this location.

10. On or about September 22, 2022, members of the FBI's Southern Ohio Safe Streets Task Force and Montgomery County Sheriff's Office RANGE Task Force conducted surveillance in Trotwood, Ohio with the assistance of an HSI aircraft. During that surveillance:

    a. the HSI aerial unit observed a silver Hyundai Palisades SUV (New York tag number KUH1337) pull next to a blue Ford Mustang and conduct what appeared to be a car-to-car narcotics transaction on Nolan Road, Trotwood, Ohio. Notably, the area where the transaction occurred is a secluded, country road with little traffic. Following that transaction, the Hyundai Palisades SUV traveled to the Sunrise Residence and parked in the driveway. A black male with dreadlocks exited the driver's seat of the vehicle and entered the residence via the back door.

8

b. Surveillance was maintained on the Ford Mustang until a traffic stop was conducted at the direction of FBI Task Force Officer Andy McCoy. TFO McCoy contacted the driver of the Ford Mustang who admitted to purchasing methamphetamine from the driver of the Hyundai Palisades SUV. The driver of the Mustang relinquished the methamphetamine to TFO McCoy, which later field tested positive for the presence of methamphetamine. The driver identified the seller's "money phone" number as 937-609-4420 and advised the seller goes by the street name "Face." TFO McCoy is familiar with the street name "Face" as being associated with HARRIS' "money phones" in a past drug trafficking investigation.

c. Based on my training and experience, as well as the events described above, I believe that the driver of the Hyundai Palisades SUV delivered methamphetamine to the driver of the Mustang in exchange for cash. I believe that, upon completing that transaction, the driver of the Hyundai returned to the Sunrise Residence with the cash proceeds which he proceeded to take inside of that location for storage and/or safekeeping.

11. Law enforcement performed a registration check on the silver Hyundai Palisades SUV (New York tag number KUH1337), and it returned a listed owner of EAN Holdings LLC (Enterprise Rent-A-Car). I contacted a representative of Enterprise Rent-A-Car and learned the vehicle is rented to WILLIAMS. Based on my training and experience, I know that drug dealers frequently use rental cars to conduct their transactions to deter their identification by police.

12. On or about September 22, 2022, after the events involving the Mustang and Hyundai, I conducted a spot check at the Sunrise Residence. The Hyundai was still parked at the residence; the black Maserati I previously observed at the Autumn Residence was now parked on the street in front of the Sunrise Residence.

13. On or about September 23, 2022, I conducted surveillance at the Autumn Residence and observed the silver Volvo sedan parked near the entrance of the apartment along with WILLIAMS' Hyundai Palisades SUV rental car.

14. During the week of September 19, 2022, TFO McCoy received information from a second confidential source (hereinafter referred to as CS2). CS2 has provided truthful and reliable information to TFO McCoy in the past, which has led to the issuance of state and federal search warrants and the seizure of narcotics. CS2 provided information to TFO McCoy for monetary gain. Specifically:

    a. CS2 advised a black male, known by the street name "Stretch" operates "money phone" number 937-853-7400 to sell large amounts of fentanyl and methamphetamine in and around Montgomery County, Ohio. CS2 agreed to conduct a controlled purchase of narcotics from "Stretch" and called the "money phone" at the direction of TFO McCoy. The male who answered the "money phone" directed CS2 to an area in Trotwood, Ohio.

    b. Before the transaction, CS2 was searched, outfitted with a wireless transmitter, and provided an amount of serialized law enforcement buy funds. CS2 was then surveilled to the pre-determined location in Trotwood, Ohio where CS2 completed a car-to-car narcotics transaction with a black male driver of a dark blue Audi SUV. Following the transaction, TFO McCoy met with CS2 and retrieved an amount of methamphetamine and fentanyl purchased from the driver of the Audi SUV. Both substances were field tested and tested positive for methamphetamine and fentanyl.

    c. Meanwhile, law enforcement maintained surveillance on the dark blue Audi SUV following the transaction and identified the driver/seller as MCCOMB. MCCOMB traveled to the Autumn Residence after the narcotics transaction and entered the residence.

Based on my training and experience, as well as the events described above, I believe that MCCOMB delivered methamphetamine and fentanyl to CS2 in exchange for cash. I believe that, upon completing that transaction, MCCOMB returned to the Autumn Residence with the cash proceeds which he proceeded to take inside of that location for storage and/or safekeeping.

15. Law enforcement performed a database check concerning 937-853-7400, i.e., the number CS2 contacted to arrange the drug transaction from MCCOMB. Records listed the owner of this number as Tamika MCCOMB, who is MCCOMB's mother.

16. During the week of October 3, 2022, CS2 conducted a second controlled purchase of narcotics from MCCOMB. Specifically:

    a. To initiate the transaction, CS2 called MCCOMB's "money phone" number and ordered narcotics. MCCOMB directed CS2 to an area in Trotwood, Ohio, where he indicated that his "sister" would deliver the narcotics.

    b. Following the call, CS2 was searched, outfitted with a wireless transmitter, and provided an amount of serialized law enforcement buy funds. Task Force members conducted surveillance at the Autumn Residence during the initial call and observed a black female exit the entry way of 5500 Autumn Hills Dr., Trotwood, Ohio shortly thereafter and enter a red Nissan, registered to Jaiya ATKINSON at 5500 Autumn Hills Dr., Trotwood, Ohio. The driver, identified as ATKINSON, drove to the pre-determined meet location and provided CS2 an amount of methamphetamine in exchange for serialized law enforcement buy funds. Following the transaction, TFO McCoy met with CS2 and retrieved the methamphetamine, which field tested positive.

    c. Law enforcement maintained surveillance on ATKINSON following the buy and observed her drive back to 5500 Autumn Hills Dr., Trotwood, Ohio and enter her

11

assigned apartment, which is Apartment 5. (As noted above, the Autumn Residence is Apartment 3 in the same complex as Apartment 5). Approximately five minutes later, ATKINSON exited her apartment and entered the back seat of a vehicle that just arrived in front of the complex. Three minutes later, ATKINSON exited the back seat of the vehicle and walked to the Autumn Residence briefly before walking back to her apartment. Approximately 20 minutes later, MCCOMB arrived at 5500 Autumn Hills Dr. driving the dark blue Audi SUV. MCCOMB exited the vehicle and walked into the Autumn Residence. Shortly afterward, MCCOMB exited the Autumn Residence and walked to ATKINSON's apartment. MCCOMB exited ATKINSON's apartment holding what appeared to be U.S. currency before walking back to the Autumn Residence.

    d.    Based on my training and experience, as well as the events described above, I believe that MCCOMB directed ATKINSON to retrieve controlled substances from the Autumn Residence and deliver them to CS2. Upon collecting the cash for the sale from CS2, ATKINSON returned to her own apartment with the buy funds. MCCOMB then arrived at the apartment complex, retrieved the buy funds from ATKINSON and took them with him into the Autumn Residence for storage.

    17.    On or about October 6, 2022, Task Force members conducted surveillance at the Sunrise Residence.

    a.    During that surveillance, WILLIAMS' silver Hyundai Palisades SUV rental was observed coming and going from the residence, driven by an unknown black female. Additionally, Task Force members observed an unknown black male exit the Sunrise Residence and drive an older white Buick sedan to the area of Nolan Rd, Trotwood, Ohio. The white Buick sedan pulled up next to a red pickup truck and conducted what appeared to be a car-to-car

narcotics transaction. Following that transaction, the white Buick sedan returned to the Sunrise Residence and the unknown black male entered that location.

        b.        Based on my training and experience, as well as the events described above, I believe that the driver of the white Buick exited the Sunrise Residence with narcotics and delivered them to the driver of the red pickup truck in exchange for cash. I base this conclusion on the nearly identical events that law enforcement witnessed on September 22, 2022, in which the Hyundai rental delivered methamphetamine to the driver of the Mustang at the same general Nolan Road location and then return to the Sunrise Residence. During the October 6, 2022, incident, I conclude that, upon completing the transaction, the driver of the white Buick returned to the Sunrise Residence with cash that he stored at that location.

18.       On the morning of October 7, 2022, I conducted surveillance at the Autumn Residence and observed the silver Volvo sedan and black Maserati SUV parked near the entrance of the apartment along with WILLIAMS' silver Hyundai Palisades SUV rental car.

19.       On the afternoon of October 7, 2022, I conducted surveillance at the Sunrise Residence and observed WILLIAMS' silver Hyundai Palisades SUV rental car parked in the driveway.

20.       On the morning of October 11, 2022, myself and FBI Task Force Officer Fred Zollers conducted surveillance at the Autumn Residence. The black Maserati SUV, the silver Volvo sedan, WILLIAMS' silver Hyundai Palisades SUV rental car, WILLIAMS' light blue Chevrolet Impala, and MCCOMB's black Jeep Grand Cherokee were all parked near the entrance at the Autumn Residence.

21. Based on the foregoing, I conclude that:

    a. HARRIS, MCCOMB, and WILLIAMS use the Autumn Residence as the primary location at which they store, process, and sell controlled substances. They also keep cash proceeds from the sale of drugs at this location. Notably, CS1 identified this location as the place at which this group actively dealt illegal drugs. Law enforcement performed controlled purchases – one the week of September 19, 2022 and the other during the week of October 3, 2022 – that had a direct connection to the Autumn Residence. During the September 2022 transaction, after receiving cash from the sale of drugs, MCCOMB directly returned to and entered the Autumn Residence. During the October 2022 transaction, agents followed ATKINSON from the complex in which the Autumn Residence is located, saw her complete a drug transaction for cash, and then return to the complex; law enforcement then witnessed MCCOMB leave ATKINSON's unit carrying cash (presumably the drug proceeds) and return to the Autumn Residence. Additionally, cars associated with the members of the drug group have been repeatedly located at the parking lot in front of the Autumn Residence. In short, I conclude that the group uses the Autumn Residence as a stash house where they process and store drugs as well as keep the proceeds from these illegal sales. I also know that drug dealers frequently keep their money phones with them. Therefore, a search of this location where the group frequents will assist law enforcement recover these devices.

    b. WILLIAMS and others used the Sunrise Residence as a secondary stash house where they keep amounts of drugs for sale to customers as well as to store cash proceeds from drug sales. As noted above, CS1 represented that the group had locations in addition to the Autumn Residence. Like the Autumn Residence, law enforcement has directly tied the Sunrise Residence to drug transactions – namely, on September 22, 2022 and October 6, 2022. During

14

the September 2022 incident, law enforcement witnessed WILLIAMS' rental vehicle engage in what appeared to be a hand-to-hand drug transaction with a Mustang. An ensuing stop of the Mustang confirmed that a drug transaction had occurred – the delivery of drugs for cash. Upon completion of the sale, the driver of the Hyundai rental vehicle returned to Sunrise, likely returning drug proceeds to that location. Similarly, on October 6, 2022, law enforcement observed a white Buick leave the Sunrise residence and engage in a transaction nearly identical to that which occurred on September 22, 2022. Once the deal was completed, the Buick returned to the Sunrise Residence. Additionally, WILLIAMS' rental vehicle has been observed repeatedly at the both the Sunrise Residence and the Autumn Residence, suggesting that the group is using this vehicle to move drugs between the two locations. This pattern of activity indicates that the group currently stores drugs as well as cash proceeds at the Sunrise Residence.

## CONCLUSION

22. Based on the facts set forth in the Affidavit, I believe there is probable cause that evidence associated with the above listed drug trafficking offenses are located within the Autumn and Sunrise Residences.

_Robert Buzzard_
Robert Buzzard
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me on this
__12th__day of October, 2022.

Caroline H. Gentry
United States Magistrate Judge

15

## ATTACHMENT A

**Location 1:** The place to be searched is 8 S. Sunrise Ave., Trotwood, Ohio 45426 and the surrounding curtilage. 8 S. Sunrise Ave., Trotwood, Ohio 45426 is a single family residence constructed of blue siding with white trim. The number "8" is affixed to the front porch pillar, left of the front door. 8 Sunrise Ave., Trotwood, Ohio is further depicted in the following photograph.



16

## ATTACHMENT A-1

**Location 2:** The place to be searched is 5500 Autumn Hills Dr., Apt. 3, Trotwood, Ohio 45426. 5500 Autumn Hills Dr. is a multi-unit apartment building constructed of red brick and gray trim. The numbers "5500" appear above the entryway of the building. Apartment 3 is located downstairs from the entryway and to the right. The number "3" is affixed above the apartment door. 5500 Autumn Hills Dr., Trotwood, Ohio is further depicted in the following photograph.



17

# ATTACHMENT B

## PROPERTY TO BE SEIZED

The items to be searched for and seized are evidence, contraband, fruits of crime, and other items illegally possessed, as well as property designed for use, intended for use, relating to violations of 21 U.S.C. §§ 846, 843(b) and 841(a)(1) including, but not limited to:

A. Log books, records, payment receipts, notes, and/or customer lists, ledgers, and other papers or electronic records relating to the transportation, ordering, purchasing, processing, and distribution of controlled substances.

B. Papers, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, and/or records, and other items relating to domestic and foreign travel to obtain and distribute narcotics and narcotics proceeds, including, but not limited to airline receipts, vehicle rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, truck logs, travel agency vouchers, notes, records of long distance telephone calls, e-mail and other correspondence.

C. Address and/or telephone books and papers reflecting names, e-mail and physical addresses and/or telephone numbers of individuals, partnerships, or corporations involved in drug trafficking and money laundering.

D. Financial records, financial statements, receipts, statements of accounts and related bank records, money, drafts, letters of credit, money orders and cashier's checks receipts, passbooks, bank checks, escrow documents, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

E. Electronic equipment such as surveillance video and related equipment, pagers, computers, electronic organizers, facsimile machines, cellular telephones, caller ID, telephone answering machines, police scanners and two-way radios, money counters.

F. United States currency, precious metals, coins, bullion, jewelry, and financial instruments, including, but not limited to stocks and bonds.

G. Photographs and/or photographic albums or video tapes and recordings of houses and other real estate, automobiles, and of other assets, persons, and/or controlled substances.

H. Indicia of occupancy, residency, and/or ownership of the premises and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, and vehicle registrations.

I. Illegal drugs, including but not limited to methamphetamine and fentanyl and other materials, paraphernalia and/or equipment and tools used in the drug trade.

J. Firearms and ammunition.